IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MATTIE YOAKUM,

                          Plaintiff,                    OPINION AND ORDER

        v.                                                    22-cv-53-wmc

MADISON UNITED
HEALTHCARE LINEN,

                          Defendant.

        *Pro se* plaintiff Mattie Yoakum alleges that her former employer, defendant Madison

United Healthcare Linen ("MUHL"), discriminated against her based on race and

retaliated against her when she complained about that discrimination, all in violation of

her rights under Title VII of the Civil Rights Act of 1964.  Defendant seeks summary

judgment on the merits of Yoakum's claims or, alternatively, for failure to exhaust her

administrative remedies.  (Dkt. #26.)  For the following reasons, the court must grant the

motion and close this case.[1]


                              UNDISPUTED FACTS[2]

        Defendant MUHL provides laundry and linen services to hospitals.  Yoakum, who

---

[1] Yoakum filed a surreply without seeking leave of court.  (Dkt. #42.)  While the court has
considered her surreply in light of Yoakum's *pro se* status, it does not change the outcome here.

[2] Unless otherwise indicated, the following facts are material and undisputed.  Consistent with its
practice, the court has drawn these facts from defendant's proposed findings to which plaintiff did
not respond, as well as the evidence of record when viewed in a light most favorable to plaintiff.
*Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) ("We must . . . construe the record in the
light most favorable to the nonmovant and avoid the temptation to decide which party's version of
the facts is more likely true.").

is black, worked there as a probationary production employee from July 15 through September 12, 2019.  First assigned to the "flat" work department ironing scrubs and handkerchiefs, Yoakum was reassigned three days later to the "tumble and fold" department where hospital gowns are folded.

However, Yoakum did not feel welcome in this new department.  Indeed, a few minutes after she started working, her coworker Monu allegedly approached her, snatched a gown from her, and yelled at her to go faster.  As Monu then walked away laughing, Yoakum started crying and told a lead worker that Monu had "attacked [her] by snatching her gown" and was "offensive."  (Dkt. #27 at 30:11-12.)  After the lead worker radioed for a supervisor, Yoakum next walked over to TJ, a supervisor, to explain what Monu had said and done to her.  In response, TJ promised to address the matter.  Yoakum followed up with TJ once more in the break room later that day, prompting TJ to say that he had already spoken with Monu *and* she would be written up for her conduct.

A few days later on July 22, Monu told Yoakum to go work at the hand towel station.  But Monu allegedly did so by calling, "hey you," several times, then getting in Yoakum's face and dismissively saying, "go over there."  (*Id.* at 38:2-6.)  Monu further kept Yoakum at that station the entire day.

On July 25, linen soiled with feces dropped on Yoakum from the tracks above her head where she was working.  Yoakum suspected Monu, who apologized to Yoakum, after which she went to the bathroom to clean herself up.  A lead worker also got Yoakum a clean uniform and said she would alert Supervisor TJ, to which Yoakum replied that she

was going to "beat [Monu] up."  (*Id.* at 33:8-11.)  Towards the end of the day, Yoakum again spoke with TJ about the incident, and TJ promised to address this issue as well.

Periodically thereafter, Monu would make Yoakum clean up other people's workstations before Yoakum would work on that station.  When Yoakum reported this conduct to TJ, however, TJ just promised once again to "take care of" the problem.  (*Id.* at 16-25.)  Further, on August 22, all employees were invited to a party jointly celebrating three birthdays, including Yoakum's.  Yoakum's coworkers from the tumble and fold department came to the party, although Monu and her friends did not touch any of the food.  The very next day, August 23, Monu's friend was pushing a large, heavy cart by herself when she ran the cart into Yoakum.  TJ was standing right near Yoakum at the time of this incident, and he told her that it was an accident.  While Monu's friend did not say anything to Yoakum immediately before or after she hit her with the cart, she told Yoakum later that same day to pull up her uniform pants even though Yoakum was wearing a long t-shirt that covered herself.  Yoakum asked her what she meant, and she repeated "pull them up," to which Yoakum replied, "okay."  (*Id.* at 47:17-18.)  Yoakum later heard Monu saying words in her native language that Yoakum believed sounded like "monkey" and "bitch."[3]  (*Id.* at 87:2-89:24.)  Also on August 23, Monu told Yoakum to go work at the hand towel machine, and Monu once more bumped into Yoakum, and told TJ that Yoakum had bumped into her.  After telling TJ about these latest incidents, he again said that he would speak with Monu.

---

[3] Yoakum describes Monu as a Hmong woman who spoke "Chinese," which Yoakum claims to understand, but the record does not confirm what language Monu speaks.  (Dkt. #27 at 29:15, 87:12-24.)

Next, on August 28, Yoakum was working at a folding machine that was jamming constantly. So she told Monu, who sent her to the next machine over. When Yoakum told Monu that the second machine was also jamming, Monu allegedly told Yoakum to go to another station because she is "just a black lazy ni[**]er lady." (*Id.* at 54:2-3.) Yoakum told Monu to never use that slur again, to which Monu allegedly responded, "I'm sorry, my friend, I'm just kidding. I'm just kidding." (*Id.* at 54:9-10.) Given the severity of the conduct, rather than just talk to TJ, this time Yoakum submitted a formal grievance to Jennifer Heibel in human resources about Monu's misconduct.

Yoakum does not know whether Jennifer also spoke with TJ about this grievance, but TJ moved Yoakum from "tumble and fold" back to the "flats" department two days later because that department needed help, after which she reports that "everything was quiet, everything was fine." (*Id.* at 56:14-15.) Between August 29 and September 12, 2019, Yoakum had no further negative interactions with any of her coworkers. Instead, on September 12, three days before the end of Yoakum's probationary period, TJ met with Yoakum in his office, and despite Yoakum's attendance being "great," TJ fired her because she did not get along with coworkers and her production numbers were too low. (*Id.* at 56:17-21.) Based on MUHL's records, Yoakum's production numbers appear to be consistently under target at MUHL in all departments.[4] (Dkt. #29-1.)

---

[4] Yoakum's production numbers were tracked under the name "Williams" because the name associated with the pin number she used was never updated while she worked at MUHL. (Dkt. #29 at ¶ 3.) In surreply, Yoakum questions the authenticity of defendant's recorded production numbers. However, at her deposition, Yoakum confirmed that she used Williams' pin. (Dkt. #27 at 34:2-11.) Accordingly, the court has no reason to disregard defendant's time records, although Yoakum also questions how her production numbers could be used to justify firing her when the machines she worked on malfunctioned.

4

Yoakum dual-filed a complaint with the Wisconsin Equal Rights Division ("ERD") and the Equal Employment Opportunity Commission ("EEOC") on September 13, 2019, alleging that she was discriminated against because of her race and opposition to discrimination in the workplace.  (Dkt. #28-1 at 3.)  In support, Yoakum stated that Monu was "mean," picked on her every day, lied about her to TJ, called her "a black lazy lady," was racist, and told TJ that Yoakum had pushed her.  (*Id.* at 3, 6.)  Yoakum further contended that Monu made her clean up after other people, dumped a lot of laundry on Yoakum for her to process, ran a cart into Yoakum's cart, laughed at Yoakum, and spoke about her, apparently derisively, in Monu's native language.  Finally, she contends that having filed a complaint about Monu harassing her, resulted in Yoakum's losing her job.

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## I.  Failure to exhaust administrative remedies

As an initial matter, defendant argues that plaintiff's claims must be dismissed because she failed to exhaust her administrative remedies.  Generally, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge.  *Cheek v. W.*

& *S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994).  Plaintiff timely dual-filed a complaint with the ERD and the EEOC alleging that defendant adversely discriminated because of her race and because she opposed discrimination at work.

Still, defendant argues that dismissal is warranted because plaintiff did not raise *all* of the supporting allegations in her administrative complaint that she seeks to raise now in this court.  Specifically, plaintiff claimed in her complaint that Monu lied about her, picked on her every day, called her a "black lazy lady," was racist, made her clean up other people's workstations, dumped a lot of laundry on her to process, and spoke and laughed about her in Monu's native language.  (Dkt. #28-1 at 6.)  Plaintiff also claimed to have filed an HR complaint about Monu's harassment and that this conflict cost her the job.  Although her allegations are not as plain or specific as they could be -- and plaintiff raises additional, related allegations now -- the law provides her "significant leeway" in that "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint," particularly for a *pro se* litigant.  *Cheek*, 31 F.3d at 500.

Regardless, because plaintiff's claims in this lawsuit are "like or reasonably related to the allegations of the charge and growing out of such allegations," the court will not dismiss them for failure to exhaust administrative remedies.  *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019) (internal quotation marks omitted).  The court must, however, disregard plaintiff's allegations that describe the misconduct of Monu's friend except as it may have some bearing as to her claims against MUHL, because that individual

6

is not implicated in plaintiff's ERD/EEOC charges.  *See Cheek*, 31 F.3d at 501 (the EEOC charge "must, at minimum, describe the *same conduct* and implicate the *same individuals*.").

## II. Hostile work environment claim

With respect to the merits of plaintiff's claims, plaintiff alleges that she was subjected to a hostile work environment based on her race for the month she was working in the tumble and fold department.  To prove that claim, plaintiff must show that:  (1) she was subject to unwelcome harassment;  (2) the harassment was based on her race;  (3) the harassment was severe or pervasive so as to alter the conditions of her work environment by creating a hostile or abusive situation;  and (4) there is a basis for employer liability. *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813 (7th Cir. 2022).  "To support a hostile work environment claim, the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose."  *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).

Although plaintiff does not claim daily harassment, she has cited a number of incidents that a jury could perceive as harassing, including being called "hey you," being told to work faster and to clean up other people's workstations, being assigned to work on malfunctioning machines, having coworkers decline food at a joint birthday celebration, and having soiled laundry allegedly dropped on her.  The court has no doubt that all of these behaviors upset plaintiff, but these incidents do not generally have a racial character or purpose, much less adoption by MUHL, and thus fail to support plaintiff's hostile work environment claim.  *Cf. Yancick*, 653 F.3d at 548 ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material

fact, then virtually all defense motions for summary judgment in such cases would be doomed." (citation omitted)).  In fact, the *only* evidence plaintiff presents that suggests racial animus comes in late August when Monu used an unidentified word in her native language that sounded to plaintiff like "monkey," and a few days later, her use of the "N" word after plaintiff complained that her machine had jammed again.

There is no "magic number" or "spectrum when it comes to the use of a racial epithet in the workplace." *Paschall,* 28 F.4th at 815 (citation omitted).  However, its infrequent use by a single coworker not alleged to be a supervisor may fall short of a hostile work environment in the relatively short time that plaintiff was in the "tumble and fold" department.  *Compare Lilly v. Roadway Express, Inc.,* 6 F. App'x 358, 359 (7th Cir. 2001) ("stray remarks and the random use of a racial epithet are insufficient to support a hostile environment claim" under Title VII); *with Hrbowski v. Worthington Steel Co.,* 358 F.3d 473, 477 (7th Cir 2004) (if an employee is "repeatedly subjected to hearing the word 'n[**]ger,'" that is enough to create a hostile work environment); *Rodgers v. W.-S. Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993) ("a supervisor's use of [an epithet] impacts the work environment far more severely than use by co-equals").  *Cf. Taylor v. W. & S. Life Ins. Co.,* 966 F.2d 1188, 1191 (7th Cir. 1992) (finding a hostile work environment where the plaintiff's boss consistently made racial comments and once held a gun to plaintiff's head, took a photo of the incident, and later showed it at a staff meeting while making racial jokes).

Of course, to avoid liability, an employer must take "prompt and effective remedial action" that was "reasonably likely to prevent future harassment." *Paschall,* 28 F.4th at 815.  Even if TJ as supervisor could be faulted for not interfering more aggressively before

8

Monu's unacceptable, racial comments in late August, there is no evidence that he was aware that any earlier actions by plaintiff's coworkers were motived by racial animus. And it is undisputed that plaintiff was moved to another department within a week of Monu's race-based comments and within two days of plaintiff's report of racial harassment to MUHL's HR Department. Moreover, plaintiff had no further issues with coworkers after that time, much less race-based issues. Indeed, plaintiff remained on the job voluntarily without incident, until *defendant* fired her. Accordingly, the court will dismiss this claim both because the conditions of her employment were not so severe as to constitute a hostile work environment and because defendant took remedial action that prevented future harassment.

### III.  Retaliation claim

Plaintiff also alleges that TJ fired her because she complained to HR about racial harassment. This claim presents a closer question, but it does not survive summary judgment on this record either. To make out a *prima face* case for retaliation in this context, plaintiff must demonstrate that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there is a but-for causal connection between the two events. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). The but-for causation standard in retaliation claims is more stringent than the standard in discrimination claims: it "does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity." *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 346-47 (2013); *see also Mollet v. City of Greenfield*, 926 F.3d 894, 897 (7th

Cir. 2019) (Title VII retaliation claims require a plaintiff to prove the protected activity was *the* but-for cause of an adverse action).

Although plaintiff alleges that TJ fired her two weeks after she complained about Monu to HR, "suspicious timing alone is not enough to establish a causal connection between the adverse action and the protected activity." *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 608 (7th Cir. 2022). Here, to bolster her claim, plaintiff asserts in briefing that TJ told her that he knew about the complaint before firing her. (Dkt. ##37 at 10; 42 at 5.) However, plaintiff testified otherwise at her deposition. Specifically, she testified that when TJ fired her, he did *not* say that he had spoken with anyone else about plaintiff's employment and that plaintiff only assumed that Heibel and TJ had spoken about her complaint. (Dkt. #27 at 64:8-65:25.) Such speculation cannot support a retaliation claim. *See Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir. 1999) ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion."). In fairness, however, even if TJ had said nothing to plaintiff about her discrimination complaint, a jury might still reasonably infer that he must have been aware of it from the fact that TJ sent plaintiff to work in another department away from Monu just two days after plaintiff spoke with Heibel in HR about Monu's conduct. Plus, Heibel does not assert otherwise in her declaration (dkt. #28), and TJ did not provide one.

Even so, there is no dispute that TJ did note in firing plaintiff that her production numbers were low *and* not improving, and defendant's employment records appear to corroborate that her objective numbers were consistently under target throughout her

10

probationary period and regardless of the department in which she worked.  (Dkt. #29-1.)
While plaintiff argues that at times she had to work on machines that jammed while in the
tumble and fold department, she offers *no* evidence (1) casting doubt on the accuracy of
defendant's overall performance numbers, including her numbers after she moved
departments (dkt. #29-1 at 2), or (2) suggesting that defendant would not typically fire
probationary employees like plaintiff at the end of their probationary periods for low
production numbers.  *See Kluge,* 64 F.4th at 895-96 (an alleged retaliatory motive is not a
but-for cause of the employee's harm where the employee would have been fired absent
the protected activity).

The court does not condone the alleged treatment plaintiff endured from some of
her coworkers or the arguable lack of diligence by her immediate supervisor in following
up as to why.  However, plaintiff has not presented evidence from which a jury could
reasonably infer that she would not have been fired but for her filing a complaint about
Monu.  Accordingly, judgment must also be entered against plaintiff's retaliation claim.

ORDER

IT IS ORDERED that:

(1) Defendant's motion for summary judgment (dkt. #26) is GRANTED; and

(2) The clerk of court is directed to enter final judgment for defendant and close this case.

Entered this 12th day of June, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge